Terry Jennings, Justice, dissenting.
The presumption that the best interest of a child is served by awarding custody to [his] natural parent[s] is deeply embedded in Texas law.... Although the facts of this case [may, to some,] present a 'close call' ... the [Texas] Legislature has mandated how close calls should be decided-in favor of the natural parent[s]. As quarterbacks, Monday morning or otherwise, we are obligated to follow the decisions of the legislative referee.[1 ]
Why are so many Texas children being raised in the fluorescent-lit hallways of state office buildings?[2] As this case serves to illustrate, part of the problem may very well be the willingness of Texas appellate *64 courts[3] to allow the Department of Family and Protective Services ("DFPS") to terminate, or, at the very least, significantly interfere with, parent-child relationships without legally- or factually-sufficient evidence.[4]
In this accelerated appeal,[5] appellants, M.G. and J.R.G., challenge the trial court's order, entered after a bench trial to a master,[6] awarding DFPS permanent managing conservatorship[7] of their four minor *65 children, J.J.G., L.K.G., H.A.G., and A.G.G.[8] (collectively, "the children") and denying M.G. and J.R.G. possessory conservatorship. In their first issues, M.G. and J.R.G. contend that the trial court erred in appointing DFPS as the children's permanent managing conservator.[9]
Here, although there is some scant evidence in the record that a "babysitter" severely injured A.G.G., there was insufficient evidence to charge her with a criminal offense. More importantly, there is no evidence in the record that either M.G. or J.R.G., the children's parents, injured A.G.G. or had any reason to know that the babysitter was capable of causing such injuries to the child. In fact, the master, who actually heard the evidence in this case, expressly found that DFPS "did not meet its burden" to obtain permanent managing conservatorship of the children and ordered M.G. and J.R.G. to be named joint managing conservators of the children. Thus, the panel majority, in its opinion, which was in accord with the longstanding presumption in Texas law that the best interest of a child is served by awarding custody to his parents, held that the evidence is legally insufficient to support the trial court's finding that the appointment of M.G. and J.R.G. as managing conservators of the children would significantly impair their physical health or emotional development and the trial court abused its discretion in appointing DFPS as the sole managing conservator of the children.
Because the en banc majority merely disagrees with the panel majority's original holding,[10] mischaracterizes the record *66 evidence, improperly holds that the presumption in favor of the children's parents is negated in this case,[11] and deprives two parents, without any evidence that they will impair their children's physical health or emotional development, of the right to care for and raise their children,[12] I respectfully dissent from the granting of en banc reconsideration in this case.
Background
On February 5, 2014, DFPS filed a petition, seeking managing conservatorship of the children and termination of the parental rights of M.G. and J.R.G. The case was tried before a master,[13] who found that DFPS "did not meet its burden" to obtain permanent managing conservatorship of the children. The master ordered that M.G. and J.R.G. "be named joint managing conservators of the[ ] children," M.G. "be designated the primary joint managing conservator," and the children be immediately returned to their parents. DFPS then filed an Emergency Motion to Stay the Return Home of the Children and a Motion for Reconsideration of the Master's Ruling with the trial court, which then appointed DFPS as the permanent managing conservator of the children and denied M.G. and J.R.G. possessory conservatorship. The trial court did not terminate the parental rights of either M.G. or J.R.G.
At trial, the master admitted into evidence the affidavit of DFPS Investigator Wanda Smith. She testified that on January 23, 2014, DFPS received a referral that A.G.G., who was seven months old at the time, had been physically abused by an "unknown perpetrator." A.G.G. had been under the supervision of "several different caregivers," and M.G. did not know how A.G.G. was injured. A.G.G.'s injuries, which included "brain bleeding, broken bone [s], and bruising," constituted a "non-accidental trauma" and were "consistent with abuse and/or neglect."
Smith further testified that M.G., "a single mother," is employed and lives with her four children. M.G. "denied ... drug and alcohol abuse, psychological history, criminal [history,] and CPS history" and "does not take any medication." Smith described A.G.G.'s siblings, J.J.G., L.K.G., and H.A.G., as "awake, alert[,] and very active," and they "appeared to be healthy and developmentally on target for their ages." Notably, J.J.G., L.K.G., and H.A.G. showed "no signs of abuse or neglect."
*67 Dr. Reena Isaac, a physician on the child protection medical team at Texas Children's Hospital, testified that she examined A.G.G. after M.G. brought him to the hospital on January 23, 2014. Isaac diagnosed A.G.G. as "a victim of abusive head trauma," noting that he had "several skeletal injuries," two subdural hematomas, a "cerebral contusion on the left side" of his head, "significant retinal hemorrhages in both of [his] eyes," and "scratches on his back." More specifically, A.G.G. had a "recent" subdural hematoma"around the back of his head" and a "more remote" one on the "frontal area[ ]" of his head, indicating that he had "suffered head trauma on more than one occasion." The "recent" subdural hematoma had likely occurred within one to three days of his arrival at the hospital, while the "more remote" subdural hematoma had likely occurred at least several weeks prior. Isaac noted that the subdural hematomas were "markers of [a] head injury," caused by "acceleration/decelerations forces" applied to A.G.G., i.e., "the child's head [was] mov[ed] very rapidly and then stop[ped] suddenly." In other words, someone could have "shak[en]" him or "shak[en]" and "throw[n] [him] onto a bed."
Dr. Isaac noted that M.G. indicated that on January 18, 2014, five days prior to his arrival at the hospital, A.G.G., who had been "strapped" into his car seat, "fell" when the car seat "dislodged" while M.G. was driving her car (the "car seat incident"). A.G.G., however, remained safely "strapped within the car seat" during the incident, was "fine," and properly ate and drank afterwards. M.G. also stated that on January 19, 2014, four days prior to his arrival at the hospital, A.G.G. fell off of a bed while at home with M.G. M.G. had "consoled" him after the fall and did not see any "obvious changes" to him at that time. Isaac explained that neither of these incidents would have caused A.G.G.'s subdural hematomas because they could not have generated "the rapid acceleration and deceleration" forces necessary "to cause the hematomas that [had] occurred in his brain." Likewise, these incidents could not have caused the "retinal hemorrhaging" found in A.G.G.'s eyes.[14] According to Isaac, it would have been impossible for a parent, such as M.G. or J.R.G., to have been able to detect the "retinal hemorrhaging."
M.G. also told Dr. Isaac that on January 21, 2014, two days prior to his arrival at the hospital, A.G.G., after he had "returned home" from the care of a "babysitter," cried for "prolonged periods of time and [was] irritable." Although irritability could be "consistent with a head injury," Isaac explained that A.G.G. also had, at the time, a cough, which could have been the source of his "irritability." However, when A.G.G. "started vomiting" two days later, on January 23, 2014, M.G. took him to a hospital, which Isaac opined was an "appropriate" action for a parent, like M.G., to take at the time.[15]
*68 Dr. Isaac further testified that A.G.G. had suffered "fractures" to both of his "distal tibias," namely, "the long bones of the legs near the ankles," "sclerosis or an injury to one of the bones within his ... left foot," and "an impaction fracture on his right radius." The fractures to the tibias, approximately "7 to 10 days old,"[16] likely occurred at the same time, as the result of "a direct ... application of force in a twisting motion." Isaac opined that the force that caused the fractures was greater than the force required for the "normal care of a child." Although M.G. reported to Isaac that A.G.G. had "gotten [his] legs caught in [his] crib," Isaac explained that such an occurrence would not have caused A.G.G.'s leg injuries, which were more "serious" and "[i]ntentionally done." And Isaac noted that A.G.G. had been seen by his primary care physician a week prior to his arrival at the hospital and that physician was not able to identify the tibia fractures. Accordingly, Isaac would not have expected "a layperson," such as a parent, to have discovered the fractures either.
Finally, Dr. Isaac opined that A.G.G.'s siblings likely did not cause any of his injuries, with the possible exception of "some of the bruises" or "scratches on [his] back," which were "superficial" in nature. A.G.G.'s injuries were "serious," would have been caused by "significant force," and were likely caused by an adult. Isaac could not say "who" had specifically injured A.G.G., but she opined that it was likely "a caregiver." M.G. reported to Isaac that in addition to herself, her sister-in-law, Veronica, and her friend, Nelly, had cared for A.G.G. during the five days prior to his arrival at the hospital. Ultimately, Isaac opined that A.G.G. had suffered from a "non-accidental trauma" and "child abuse," and A.G.G. "could have died," had M.G. not sought treatment for her son. She further noted that A.G.G.'s siblings were examined by the medical staff at the hospital and found to be healthy.[17]
DFPS caseworker Nicole Franco, who was assigned to the children's case in January 2015, testified that she had seen the children seven times prior to trial. And M.G. had indicated to Franco that "three individuals," herself, Veronica, and Nelly, had had access to A.G.G. during the time that he was likely injured.
In regard to the children, Franco explained that each child has his or her own "needs." For instance, J.J.G. currently "requires speech therapy" and "participates in individual play therapy"; L.K.G. requires "[s]peech therapy and individual play therapy"; H.A.G. "requires speech therapy," is not "potty trained," and requires "PPCD," which is a "[s]upport service[ ] through ... school"; and A.G.G. requires "continue[d] treatment" by an ophthalmologist, additional surgery "around the age of five" related to his *69 eyes, and "occupational, physical, and speech therapy." Franco noted that J.J.G., L.K.G., and H.A.G., when they entered into the care of DFPS, showed no "sign[s]" of physical abuse. Although the older children were later "diagnosed with anemia" and J.J.G. was considered to be "under weight," Franco explained that such issues were not "severe" and would not have served as grounds to remove the children from M.G.'s care.[18] Franco further noted that J.J.G. and L.K.G., who were five years old and four years old at the time, respectively, did not "want to go home to" M.G. or J.R.G. And she opined that it is in the best interest of the children for "parental rights to be terminated" or "[f]or the children to remain in the custody" of DFPS.
In regard to J.R.G., Franco noted that she had discussed his Family Service Plan ("FSP") with him, but he had not provided "verification" to DFPS about his employment or housing. Franco had actually visited J.R.G.'s home though, noting that the "structure of the home" that J.R.G. shares with his wife, a woman other than M.G., satisfies DFPS. However, according to Franco, J.R.G.'s "wife does not want the children there" and "doesn't want to take the responsibility of caring for [the] children." Franco further noted that J.R.G. did not attend a required "permanency hearing on May 19, 2015." And he had attended only three out of approximately twenty-two scheduled visits with the children since the time that he was served in the instant case. J.R.G. also failed to provide DFPS with certification of his participation in parenting classes, although he had indicated to Franco that "he had done some of the classes ... [and] only had a few more of them to do." Moreover, although J.R.G. did "participate[ ] in [the required] psychosocial assessment," he had not yet "participated in family therapy."
Franco cited J.R.G.'s lack of "active[ ] participat[ion]" and a lack of "a desire to care for all four of his children" as the reason DFPS did not want the children returned to him. And Franco expressed concern that J.R.G. had not "consistently been a part of the children's lives," had not "provided them with financial support," and had not "consistently visited with them or formed a bond with them."
Franco further testified, in regard to M.G., that she, under her FSP, was required to "participa[te] in and successfully complete individual therapy." M.G., who was initially "discharged" from "individual therapy sessions," was, at the time of trial, still participating in therapy at the request of DFPS. M.G. had also completed her required "psychosocial evaluation," completed her required parenting classes, and provided DFPS with certification of her completion of her classes. And M.G. continued to work on implementing the parenting "skills" she learned during her "family therapy sessions" with the children. When Franco last visited with M.G., approximately one month before trial, M.G. indicated that she would soon be "transition[ing]" into a two-bedroom apartment. And she noted that if the children were returned to her, she "intended to use a day care center" while she was at work. Franco also noted that M.G. had "consistently" attended her visits with the children and had "no CPS or criminal history." Further, M.G. had provided DFPS with "pay stubs" to verify her employment.
*70 Franco, who admittedly had never observed any of M.G.'s scheduled visits with the children nor attended any of the family's therapy sessions, cited M.G.'s judgment in terms of "the children's care," including her decision to "[l]eav[e] the[ ] [children] with inappropriate caregivers," the car seat incident, and the "falling off the bed" incident involving A.G.G., as the reason why DFPS did not want to the children returned to M.G. And Franco noted the there was still an "open" law enforcement investigation related to the injuries to A.G.G. However, Franco admitted that M.G. has willingly spoken with law enforcement officers about A.G.G.'s injuries and willingly spoken with "the social worker at the hospital" and other DFPS investigators regarding A.G.G. And Franco noted that M.G. has never "been charged ... for [a] crime" related to A.G.G.
Finally, Franco opined that both Veronica, M.G.'s sister-in-law, and another woman, Norma, were "inappropriate" caregivers for the children. It appears from the record that M.G. had suggested Norma as a possible placement for the children after A.G.G. was injured, but Franco asserted at trial that M.G.'s suggestion was not "appropriate" because "[t]here was an individual in [Norma's] home who had a [recent] DWI." On cross-examination, however, Franco admitted that DFPS, while acting as temporary managing conservator of the children, had actually "placed" A.G.G. with Norma for "[f]our months" after he was injured. And while placed with Norma, A.G.G. had not been "injured" and his needs had been met.
In regard to Veronica, Franco's concerns, as expressed at trial, seem to center on her possible role in injuring A.G.G., that DFPS "has never been provided with appropriate contact information to speak with [her]," and that M.G. has not expressed "concern[ ]" about previously leaving the children in Veronica's care. On cross-examination, however, Franco admitted that a "CPS investigator" had actually "spoke[n] to Veronica" and DFPS had "actually approved placement of the children" with Veronica after A.G.G. was injured. In fact, after a visit to Veronica's home, DFPS had "no safety concerns" about Veronica, and Franco noted that Veronica has "no criminal or CPS history," has her own children, and DFPS had gone so far as to complete "[a] background check" on her.
Dianne Del Sol, the owner of the day-care facility that the children currently attend, testified that when J.J.G., who was almost four years old at the time, began attending the facility, he was "very shy," "not capable of having social interactions with the rest of the children," "spoke very little English," "did not know his shapes, colors, [or] numbers," "did not know how to write his name," and was not "potty trained." However, he "could speak Spanish," was "verbal in the Spanish language," and did not have a "speech delay." Del Sol also opined that there was "nothing wrong" with the fact that J.J.G. was "withdrawn to himself" and that he liked to "do[ ] his own activities."
Del Sol further testified that, initially, L.K.G., who was almost three years old at the time, had "emotional outburst[s]" and "would cry for no reason." And H.A.G., who was "less than two years old" when she started at the day-care facility, was "difficult to deal with." She would "sit there and just cry with her mouth hanging open and slobber dro[o]ling down," and she could not be consoled. Del Sol noted, however, that such behavior could have been occurring because H.A.G. missed her mother. Del Sol opined that it would have been "stressful" on the children at the time to have been taken away from M.G., the "only mother" that they had ever known.
*71 In regard to A.G.G., who was less than one year old when he began attending the day-care facility, he did not have crying "outbursts" and "easily interact[ed] with the other children." However, he "had a very difficult time walking and his vision is impaired."
Del Sol explained that, while in the care of DFPS, J.J.G., L.K.G., and H.A.G. have received speech therapy and A.G.G. has received therapy for "walking." And the children, at the time of trial, were no longer experiencing any delays in development. J.J.G. is "very outgoing," "[s]peaks well,"[19] and "knows his colors, shapes, [and] numbers." L.K.G. is "doing well," "does her class work," and "interacts with her friends." H.A.G. "still has a lot of ... emotional distress," but "[n]ot nearly to the [same] extent." And A.G.G. is "very well adjusted," although he "struggles with [his] vision" and "his walking is a little uneven," which requires him to be watched "very closely." Del Sol acknowledged, however, that A.G.G. is also a "small toddler" who is simply "not steady on his feet." And the children, in general, are not "difficult to keep up with."
Gabriela Morgan, a psychotherapist with Valentia Bilingual Therapy Services, PLLC, testified that M.G., while this case was pending, had attended both individual counseling and family therapy sessions with her, approximately once a week, for more than a year.[20] Some of M.G.'s scheduled visits with the children had also taken place "through [Morgan's] service." And, at the time of trial, she was still conducting family therapy sessions with M.G. and the children. Morgan opined that J.J.G. was "bonded" with M.G., although she had not seen the other children "cry for" their mother. And she explained that M.G. has "consistent[ly]" and "time[ly]" attended all of her therapy sessions and her "behavior in the session[s] [is] cooperative and attentive." In fact, in her therapy notes, Morgan describes M.G. as "very active and responsive."
M.G. initially told Morgan that she had "[n]o idea" "how [A.G.G.] got hurt" and A.G.G. had "just woke[n] up crying, which was unlike him and [she] took him to the doctor." However, over time, as M.G. progressed in therapy, she indicated to Morgan that she believes that Veronica hurt A.G.G.[21] This concerned Morgan because M.G., two or three months prior to trial, had also indicated that her relationship with Veronica was "close," "they talk[ed] a lot," and Veronica was "one of her support systems." Notably though, Morgan contradicted this testimony, stating at trial that she would not be concerned if "Veronica was identified as the prim[ary] support for [M.G.]"
Morgan further testified that M.G. "has not said anything" or done "anything" that has "caused [her] to believe" that M.G. caused A.G.G.'s injuries. In fact, M.G. had repeatedly denied injuring A.G.G., and Morgan noted that "the possibility of [M.G.] having been the one to hurt her *72 child [ ] is low. " (Emphasis added.) And in her therapy notes, Morgan indicates that M.G. had denied "any kind of domestic violence in the home" and "ha[d] no history of assaultive behavior" or "self[-]injurious behavior." Morgan further opined that M.G. is "not homicidal," "suicidal," or "aggressive." And her "risk of VIOLENCE" to be "VERY LOW or absent."
In regard to M.G.'s ability to care for the children, Morgan testified that she does become "overwhelmed" and "highly stressed" when around the children. And "when [M.G.] is with one [child] she can't seem to direct her attention to anything else and that's when the kids start roaming and moving around and doing other stuff." However, M.G. "cares [for] and loves" her children, and her "love for her children seems genuine." And M.G. was "devastated" by A.G.G.'s injuries. On cross-examination, Morgan admitted that although she feels that M.G. "become[s] very overwhelmed when she has all four [children]," caring for four young children would be difficult for "any mother." (Emphasis added.) And there are no "clinical reasons" that would impair M.G. from being able to parent the children. Further, when Morgan discussed with M.G. the possibility of changing her work schedule in order to accommodate the children's schedules better, M.G. "stated that she would be able to do that so she could have a day care provider during the day," rather than working at night.
Morgan also explained that she initially "discharged" M.G. from individual therapy on July 28, 2014, noting that the "discharge" was "regular," and M.G. was "done" with therapy. In other words, Morgan "had set some [therapy] goals" for M.G., and M.G. "had achieved those goals" and "made progress." And at the time of M.G.'s initial discharge, Morgan did not "see any[thing] prohibit[ing]" M.G. from "parenting her children." However, when DFPS subsequently referred M.G. back to her for "more therapy," M.G. willingly complied.
In January 2015, Morgan noted that M.G. had "progressed with communicating and asserting herself" and M.G. believed that it is "her responsibility to take care of her children." Further, M.G. had "identif[ied] changes needed in her routine structure and support system in order to show that she's able to manage taking care of her children[ ]." And M.G. has "made progress" while working with Morgan. Morgan's main "concern" for M.G. was her lack of a "support system." However, she noted that her concerns would be alleviated if M.G. secured a day-care program for the children or if M.G. secured "responsible adults" to "take care of the children" while she is at work.
In regard to J.R.G., Morgan noted that she began seeing him, both individually and with M.G. for "joint session[s]," in 2014. Morgan could not recall how many times that J.R.G. had seen her individually, but she estimated that he had attended more than five joint sessions with M.G. and her notes reflect that he was "consistent in attending all sessions."[22] During their joint sessions, J.R.G. was "forthcoming" and "clear," and it appeared to Morgan that he "wanted to work on a plan for the kids and [to] be clear about where he stood." Morgan opined that it is not possible for J.R.G. to "parent" "all four" children, but "he would be able to take two."[23]
*73 M.G. testified that she met J.R.G. in November 2008 and became pregnant with J.J.G. in 2009. At that time, she was not aware that J.R.G. was married to another woman.[24] While she was pregnant, she saw J.R.G. "every now and then," and she "stopped seeing him" for a period of time because "he left" "[t]o work." He provided no support for M.G. before or during her pregnancy with J.J.G. After J.J.G. was born on March 3, 2010, M.G. saw J.R.G. "more frequently" and she became pregnant with L.K.G., who was born on March 5, 2011. Although J.R.G. did not provide M.G. with any financial assistance before or during her pregnancy with L.K.G., she continued to see him. After H.A.G. was born on June 7, 2012, J.R.G. "started to help" M.G. because she "told him he really needed to help" as "there were more children, more expenses, and more responsibility." She explained that she had not previously asked J.R.G. for financial assistance because she had been working and was not having financial difficulty. After the birth of H.A.G., J.R.G. gave M.G. approximately $400 to $500 every month, "to pay [her] rent or [for] things that [she] needed," and he has "continued to pay [her] rent" since that time.
M.G. explained that while she was pregnant with A.G.G., J.R.G., in March 2013, told her that he had to "move[ ] to Mexico," but he continued to send her money "[s]ometimes," "[l]ike [for] about five months."[25] Subsequently, after A.G.G. was born on May 31, 2013, M.G. saw J.R.G. in January 2014, prior to A.G.G. being injured. Although she and the children did not "see" J.R.G. from March 2013 to January 2014, she spoke to him by telephone "every three days." When J.R.G. returned in January 2014, he "support[ed]" her again with $400 to $450 per month continuously. Further, M.G. noted that since she and J.R.G. signed an "Irrevocable Children's Protective Services Mediated Settlement Agreement" in February 2015, J.R.G. has been providing her with $1,500 a month.[26]
M.G. opined that J.R.G. is a "good father," who "loves the children" and "pays attention to them." However, she admitted that it was not "responsible" for him to "disappear for long periods of time," which indicates that he is not "there for his children." And when J.R.G. does visit the children, it is usually for "two or three hours," once or twice a week. During his visits, he watches movies with the children, plays with them, and devotes time to them. In regard to J.J.G. specifically, J.R.G. had visited him "[m]any" times.
M.G. noted that she is employed as a cook at a restaurant, where she has worked for the past seven years. Earning between $550 and $600 every two weeks, she works in the mornings thirty-five to forty hours per week. M.G. had previously worked at night from approximately 4:00 p.m. or 5:00 p.m. to 11:00 p.m. or 11:30 p.m. However, if the children are returned to her, she will continue to work "[j]ust mornings." During the week prior to trial, she had worked thirty-nine hours, and she had Friday and Sunday "off."
M.G. further testified that her monthly expenses include $435 for rent, $120 for *74 food, $200 for a car payment, $80 for electricity, $80 for gas, and $60 for her telephone. She has also put down a deposit for a two-bedroom apartment and is "getting ready to move." And she had "looked into day care" for the children, specifically, Sharpstown Day Care, which the children would attend while she works. M.G. also noted that if the children are returned to her, she will be "pick[ing] them up from school, bath[ing] them, [and] help [ing] them on their home work."[27]
Prior to the children entering into the care of DFPS, either M.G.'s sister-in-law, Veronica, her friend, Nelly, or another woman, Ramona, took care of the children while M.G. worked.[28] And M.G. cared for the children when she was not at work. In the two weeks prior to A.G.G. being injured, both Veronica and Nelly, in addition to M.G., had cared for A.G.G., and J.R.G. had also seen the children during those two weeks. And although J.R.G. likely saw the children "a week before" A.G.G. was injured, he was "[a]lmost never" alone with them.
Moreover, in the beginning of January, M.G., noticing that A.G.G. had returned from Veronica's care with a bruise and a scrape, "thought [that] he might have fallen." The bruise on his forehead was the size of "a dime," and Veronica had told her that the scrape had come from "the carpet." The master admitted into evidence medical records that show that A.G.G.'s primary care physician saw him a week before M.G. took him to the hospital, and the physician noted in his report that A.G.G. was not in "apparent distress" and was "well nourished" and "well developed."
M.G. agreed that A.G.G. had suffered serious injuries in this case, "whoever caused those injuries ... should be punished," and A.G.G. had been in the care of Veronica, Nelly, and herself during the relevant time period. Thus, she concluded that "one of the three" of them had injured A.G.G. However, M.G. denied "shak[ing]" A.G.G. and "twist[ing] his ankles," noting that she had "never harmed any of [her] children." She spoke "tw[o] or three times" to law enforcement officers about A.G.G.'s injuries, and she "think[s]" that Veronica hurt A.G.G. M.G. is also aware that A.G.G. "has to have very special care now" and will require additional surgery related to his eyes.
M.G. noted that she had a "[g]ood" relationship with Veronica, who was still married to M.G.'s brother. However, M.G. stated that Veronica is not part of her support system "anymore," and since A.G.G. was injured, she does not "turn [ ] to Veronica for help," rather, she "just talk[s] to her."
Before the children entered into the care of DFPS, a typical day with them, when M.G. was not working, consisted of her making the children breakfast, "go [ing] to the store to run ... errands" with them, and "visit[ing] with [her] little *75 cousins where [the] children like[d] to go to visit so they could play." M.G. cooked for the children, bathed them, "watch[ed] movies with them," "play[ed] and dance[d] with them," and "sang with them." She described the children as "very active and very happy with [her]."
When M.G. sees the children now during scheduled visits, she brings them food or gifts, and the children display affection towards her. "They are very loving" towards her and tell her, "[M]ommy we love you. I love you.... We want to go with you." According to M.G., Franco, the DFPS caseworker, has never been present for any of her visits with the children. And M.G., in addition to any therapy sessions she has with the children, has only been allowed, at the behest of DFPS, to see the children for two hours per month since they entered into the care of DFPS.
In regard to M.G., the master admitted into evidence a "2054 Psychological Evaluation" report, dated October 22, 2014, stating that M.G. "denie[d] any current alcohol or drug use" and "denied all criterion depression symptoms except for sadness because of [the removal of] her children." The report also states that M.G. has "no report[ed] ... psychiatric history," "no suicidal or self-injurious ideation and no intent or plan," "[n]o criterion symptoms of bipolar manic phase," "no generalized anxiety," no reported "[p]anic [d]isorder," no reported obsessive compulsive disorder, "[n]o criterion symptoms of posttraumatic stress disorder," "[n]o criteri[on] symptoms" of "[t]hought [d]isorder/[p]sychosis," and no reported "[h]allucinosis." M.G.'s "hygiene appeared reasonably tended to," and throughout the evaluation, she maintained "good" eye contact, her "[a]ttitude was open and cooperative," and her "effort level during [the] interview and mental status testing was good." The report also notes that M.G.'s "[t]hought [p]rocess" is "logical," "coherent," and "goal-directed." And she had a "positive interaction" with the examiner. M.G.'s "[p]rognosis" was determined to be "GOOD"; she did not "demonstrate any signs or symptoms of a psychological condition"; she had "no serious levels of depression, anxiety, or hopelessness"; her "results, when matched against non-patient female norms, indicated no significant psychological distress in any domain"; and she was not diagnosed with a "psychiatric illness" or a "personality disorder."
J.R.G. testified that he has seven children, the youngest four of which are the subject of the instant case.[29] He explained that although he has been in a relationship with M.G. for approximately seven years, he is married to another woman. Until two years ago, J.R.G. was "a loving father," but he did not assume responsibility for the children. However, before the children entered into DFPS's care, he was "becoming more involved" in their lives because he "wanted" to "take care" of them. Within the last two years, J.R.G. has become "a little closer" to the children and has taken "responsib [ility] for the expenses [that M.G.] incurs because of the children." For instance, for the last two years, he has been "giving [M.G.] ... money for [her] rent" and $1,500 for the four months prior to trial in accordance with an Irrevocable Children's Protective Services Mediated Settlement Agreement, which he signed. J.R.G. noted that he began providing M.G. with financial assistance after she requested it, and he has no concerns about "any physical danger" to the children if they are returned to M.G. He has never seen any indication that the older children, J.J.G., L.K.G., and H.A.G., were not "well provided for" when they lived with M.G. And *76 J.R.G. indicated that he would continue to stay involved in the children's lives and support them if they are returned to M.G. He is currently employed, installing wood flooring, and he is paid $2,400 per month.
J.R.G. admitted that he left while M.G. was pregnant with J.J.G. However, he now does not "know what was going on in [his] head" at the time. He also admitted to leaving M.G. after L.K.G. was born. J.R.G. explained that when M.G. was "three months pregnant" with A.G.G., he "stayed away from her [for] about three or four months." However, he began seeing her again in November 2013 and onward, although "not frequently." And while he was "away," he continued to send her money.
J.R.G. was aware that both Veronica and Nelly cared for the children while M.G. was at work. He explained that he became concerned about A.G.G. in "early" January when he saw on A.G.G.'s face a bruise, "[s]maller than a dime," and a "small" "scratch" or "scrape" about "the size of a dime." J.R.G. thought that the bruise and scratch could have happened by "accident" because the children "jump around" A.G.G., and he has told them in the past to be careful. And neither the bruise nor the scratch caused J.R.G. to "fear that [A.G.G.'s] physical and emotional well being were in danger." He did, however, tell M.G. to ask Veronica to be more careful when she cared for A.G.G.
After M.G. took A.G.G. to a hospital on January 23, 2014, J.R.G. arrived "the following day," but he did not learn of DFPS's involvement until "two or three days later," when M.G. told him that "she was going to be investigated." He told "[e]verybody" at the hospital that he was A.G.G.'s father. And although he had "tried to talk to someone" to "tell them or let them know that [he] could pick up [the] children," whomever he spoke with informed him that he "couldn't do anything." Further, DFPS has never interviewed him about A.G.G.'s injuries. J.R.G. explained that he was not initially involved in the instant case because he did not "think" it pertained to him and he had been told that he "had nothing to do." He has seen the children "six or seven times" since they have entered into the care of DFPS, and DFPS and the foster parents have "canceled" appointments with him on certain occasions. J.R.G. stated that he loves the children, he was "concerned" when he heard that A.G.G. was in the hospital, and J.J.G., L.K.G., and H.A.G. are "bonded" with him.[30]
Currently, J.R.G. lives with his wife, who has said that all of the children cannot live in their home.[31] However, J.R.G. "would move with [the] children" somewhere "alone," "get an apartment," and provide them with "stable housing" if they are returned to him. J.R.G. explained that although, during the pendency of this case, he had "moved" out of the home that he shared with his wife, he subsequently moved back into the home for financial reasons and because one of his daughters was having "problems."[32] J.R.G. agreed that it was not "a good situation to bring four children into th[e] world when [he was] married to somebody else," but stated that the children are "here" now and he has "to take care of them." Further, he had provided his three oldest children with food, shelter, and education, does not have a criminal record, and has "[a]lways" worked.
*77 In regard to A.G.G., J.R.G. does not know who "broke [A.G.G.'s] ankles" or who "shook [A.G.G.] so hard [that] he got multiple brain bleeds." He is very "concern[ed]" about what happened to A.G.G., noting that his since birth, M.G. had been taking A.G.G. to a doctor "regularly," including the week before she took him to the hospital.[33] And J.R.G. visited M.G. "three times" in January prior to A.G.G. being injured.
J.R.G. further testified that he attended therapy sessions and has seen Morgan "[a]bout six times," including four individual sessions and two joint sessions with M.G. He also completed the required psychosocial evaluation, and J.R.G. noted that he has had only one "face-to-face" meeting with Franco, the DFPS caseworker.
Standard of Review
The standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for the termination of parental rights. See In re J.A.J. , 243 S.W.3d 611, 616 (Tex. 2007) ; In re A.C. , 394 S.W.3d 633, 644 (Tex. App.-Houston [1st Dist.] 2012, no pet.). Unlike the standard of proof for the termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need only be established by a preponderance of the evidence. In re J.A.J. , 243 S.W.3d at 616 ; see TEX. FAM. CODE ANN. § 105.005 (Vernon 2014). Moreover, we review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion. In re J.A.J. , 243 S.W.3d at 616 ; Earvin v. Dep't of Family & Protective Servs. , 229 S.W.3d 345, 350 (Tex. App.-Houston [1st Dist.] 2007, no pet.). Accordingly, we will reverse a trial court's appointment of a non-parent as sole managing conservator only if we determine that it is arbitrary or unreasonable. In re J.A.J. , 243 S.W.3d at 616 ; Earvin , 229 S.W.3d at 350. We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment. Earvin , 229 S.W.3d at 350. A trial court abuses its discretion by ruling without supporting evidence. Ford Motor Co. v. Garcia , 363 S.W.3d 573, 578 (Tex. 2012).
When applying an abuse-of-discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but are factors used in assessing whether the trial court abused its discretion. Mai v. Mai , 853 S.W.2d 615, 618 (Tex. App.-Houston [1st Dist.] 1993, no writ) ; see also McGuire v. McGuire , 4 S.W.3d 382, 387 n.2 (Tex. App.-Houston [1st Dist.] 1999, no pet.) (sufficiency challenges are incorporated into abuse of discretion determination). To determine whether a trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we consider (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether it erred in its application of that discretion. Bush v. Bush , 336 S.W.3d 722, 729 (Tex. App.-Houston [1st Dist.] 2010, no pet.) ; see also Moroch v. Collins , 174 S.W.3d 849, 857 (Tex. App.-Dallas 2005, pet. denied). We conduct the applicable sufficiency review when considering the first prong of *78 the test. Bush , 336 S.W.3d at 729 ; see also In re S.T. , 508 S.W.3d 482, 489 (Tex. App.-Fort Worth 2015, no pet.). We then determine whether, based on the evidence, the trial court made a reasonable decision. In re S.T. , 508 S.W.3d at 489 ; Moroch , 174 S.W.3d at 857.
In a legal-sufficiency review, we consider all of the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. City of Keller v. Wilson , 168 S.W.3d 802, 822 (Tex. 2005). We consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not disregard it. Id. at 827 ; Brown v. Brown , 236 S.W.3d 343, 348 (Tex. App.-Houston [1st Dist.] 2007, no pet.). The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. City of Keller , 168 S.W.3d at 819. The final test is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." Id. at 827.
In a factual-sufficiency review, we consider all the evidence for and against the challenged finding and set it aside only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986). In a bench trial, the trial court is the sole judge of the credibility of the witnesses. Bush , 336 S.W.3d at 730.
Permanent Managing Conservatorship
In their first issues, M.G. and J.R.G. argue that the trial court erred in appointing DFPS as the children's permanent managing conservator because the evidence is legally and factually insufficient to establish that the appointment of M.G. and J.R.G. as the children's managing conservators would significantly impair their physical health and emotional development. See TEX. FAM. CODE ANN. § 153.131 (Vernon 2014), § 263.404(a) (Vernon Supp. 2016).
A managing conservator is a person or entity who, by court order, has been awarded custody of a child and may determine the child's primary residence. See Phillips v. Beaber , 995 S.W.2d 655, 660 (Tex. 1999) ; In re C.A.M.M. , 243 S.W.3d 211, 215 n.7 (Tex. App.-Houston [14th Dist.] 2007, pet. denied) ; see also TEX. FAM. CODE ANN. § 153.132 (Vernon 2014) (listing "rights and duties" of parent appointed sole managing conservator), § 153.371 (Vernon Supp. 2016) (listing "rights and duties" of non-parent appointed as sole managing conservator). The managing conservator has nearly sole authority to make decisions for the child. See TEX. FAM. CODE ANN. §§ 153.132(1) - (9), 153.371(1) - (11) ; see also In re R.L. , Nos. 01-16-00852-CV, 01-16-00875-CV, 2017 WL 1496955, at *13 (Tex. App.-Houston [1st Dist.] Apr. 21, 2017, no pet.) (mem. op.); In re N.L.D. , 412 S.W.3d 810, 816 (Tex. App.-Texarkana 2013, no pet.) ("Conservatorship of a child includes the day-to-day management of the child.").
The primary consideration in determining issues of conservatorship and possession of and access to a child is always the child's best interest.[34] See *79 TEX. FAM. CODE ANN. § 153.002 (Vernon 2014) ; In re J.A.J. , 243 S.W.3d at 614 ; In re R.L. , 2017 WL 1496955, at *14. The Texas Family Code authorizes the appointment of a managing conservator or joint managing conservators, and it provides that the managing conservator must be a parent, a competent adult, DFPS, or a licensed child-placing agency. TEX. FAM. CODE ANN. § 153.005(a) - (b) (Vernon Supp. 2016); In re J.A.J. , 243 S.W.3d at 614 ; see also In re R.L. , 2017 WL 1496955, at *14.
Although rebuttable, the Family Code creates a strong presumption that it is in the child's best interest for his parents to be named joint managing conservators, and it imposes a heavy burden on a non-parent to rebut this presumption.[35] TEX. FAM. CODE ANN. § 153.131(a) - (b) ; In re V.L.K. , 24 S.W.3d 338, 341, 343 (Tex. 2000) (explaining natural parent "has the benefit of the parental presumption ... and the nonparent seeking conservatorship has a higher burden" (emphasis added)); Lewelling v. Lewelling , 796 S.W.2d 164, 167 (Tex. 1990) ; see also In re R.L. , 2017 WL 1496955, at *14 ; Whitworth v. Whitworth , 222 S.W.3d 616, 623 (Tex. App.-Houston [1st Dist.] 2007, no pet.) ("There is a strong presumption that the best interest of a child is served if a natural parent is appointed as a managing conservator."). In order to rebut the presumption and appoint someone other than a parent as the managing conservator of a child, the party seeking appointment as managing conservator must affirmatively prove, and the trial court must find, that the appointment of a parent would "significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN. § 153.131(a) ; In re J.A.J. , 243 S.W.3d at 616 ; Lewelling , 796 S.W.2d at 166-67 ; see also In re R.L. , 2017 WL 1496955, at *14.
Family Code section 263.404 governs a trial court's appointment of DFPS as a child's managing conservator without the termination of parental rights, and it allows the trial court to render a final order appointing DFPS as a child's managing conservator if the court finds that: (1) a parent's appointment would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development and (2) the appointment of a relative of the child or another person would not be in the child's best interest. TEX. FAM. CODE ANN. § 263.404(a) ; see also In re J.A.J. , 243 S.W.3d at 614 (" Section 263.404 of the Family Code allows the court to render a final order appointing the Department as the child's conservator without terminating parental rights....") In re R.L. , 2017 WL 1496955, at *14. In deciding whether to appoint DFPS without terminating parental rights, the court must consider the needs and desires of the child. See TEX. FAM. CODE ANN. § 263.404(b) (other factors listed do not apply to instant case because of children's ages); In re J.A.J. , 243 S.W.3d at 614 ; see also In re R.L. , 2017 WL 1496955, at *14. As evidence, DFPS must offer "specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." Lewelling , 796 S.W.2d at 167 (emphasis added);
*80 see also In re R.L. , 2017 WL 1496955, at *14 ; In re L.W. , No. 02-16-00091-CV, 2016 WL 3960600, at *3 (Tex. App.-Fort Worth July 21, 2016, no pet.) (mem. op.) (there must be "some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions of the parent").
The Texas Supreme Court has noted that although trial courts are "afforded broad discretion in deciding family law questions, the legislature has explicitly limited the exercise of that discretion when a nonparent seeks appointment as managing conservator." Lewelling , 796 S.W.2d at 168. "[C]lose calls" are to be decided "in favor of the natural parent." Id. ; see also In re K.R.P. , 80 S.W.3d 669, 675 (Tex. App.-Houston [1st Dist.] 2002, pet. denied) ; In re De La Pena , 999 S.W.2d 521, 528 (Tex. App.-El Paso 1999, no pet.) ; In re M.W. , 959 S.W.2d 661, 665-66 (Tex. App.-Tyler 1997, writ denied) ("When a non-parent and a parent are both seeking managing conservatorship, close calls go to the parent in [an] evidentiary review." (internal quotations omitted)).
In regard to the presumption in favor of the parent, it is imperative at this juncture to note that the en banc majority misunderstands the strong presumption in favor of the children's parents and its application to the instant case. See TEX. FAM. CODE ANN. § 153.131(a) - (b) ; In re V.L.K. , 24 S.W.3d at 341, 343 ; Lewelling , 796 S.W.2d at 167 ; see also In re R.L. , 2017 WL 1496955, at *14 ; Whitworth , 222 S.W.3d at 623. Although the en banc majority acknowledges that such a presumption exists, it states that DFPS, in this case, may overcome the presumption in favor of the parents by relying on Family Code section 153.004(b), which provides:
It is a rebuttable presumption that the appointment of a parent as the sole managing conservator of a child or as the conservator who has the exclusive right to determine the primary residence of a child is not in the best interest of the child if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by that parent directed against the other parent, a spouse, or a child.
TEX. FAM. CODE ANN. § 153.004(b) (Vernon 2014) (emphasis added); see also id. 153.101(b). Thus, the en banc majority asserts that, in the present case, section 153.004 operates to "replace[ ]" the parental presumption with "the opposite presumption-i.e., that appointment of a ... parent as ... conservator is not in the child's best interest" if "a history or pattern of past or present child neglect or physical abuse" has been shown.
However, in doing so, the en banc majority neglects to realize that, in order for section 153.004(b) to be applied to this case, the trial court had to make a specific "finding of abuse or neglect" for DFPS to utilize that provision to negate the strong presumption in favor of the children's parents. See In re K.S. , 492 S.W.3d 419, 427 & n.12 (Tex. App.-Houston [14th Dist.] 2016, pet. denied) ; Baker v. Baker , 469 S.W.3d 269, 275-76 (Tex. App.-Houston [14th Dist.] 2015, no pet.) ; In re A.M. , 418 S.W.3d 830, 843 (Tex. App.-Dallas 2013, no pet.) ; Stallworth v. Stallworth , 201 S.W.3d 338, 347 (Tex. App.-Dallas 2006, no pet.) ; In re Marriage of Collier , 419 S.W.3d 390, 396-97 (Tex. App.-Amarillo 2011, pet. denied) ; see also TEX. FAM. CODE ANN. § 153.131(b) ("A finding of a history of family violence involving the parents of a child removes the presumption" in favor of them (emphasis added)).
Notably, no such finding was made by the trial court in this case, nor was one requested by any party. See, e.g. , In re K.S. , 492 S.W.3d at 427 n.11 (noting trial *81 court's order stated: "The court finds that [parents] have a history or pattern of neglect and/or physical abuse of the children...." (internal quotations omitted)); Hinojosa v. Hinojosa , No. 14-11-00989-CV, 2013 WL 1437718, at *2-4 n.2 (Tex. App.-Houston [14th Dist.] Apr. 9, 2013, no pet.) (mem. op.) (explaining party did not request application of section 153.004(b), did not obtain finding relative to section 153.004(b), and trial court did not make such finding); Viera v. Viera , 331 S.W.3d 195, 209-10 (Tex. App.-El Paso 2011, no pet.) (trial court did not abuse its discretion in appointing parents joint managing conservators where trial court entered no findings of fact or conclusions of law pursuant to section 153.004(b) regarding family violence); see also TEX. FAM. CODE ANN. § 153.131(b). Thus, the en banc majority's reliance on section 153.004 to "replace[ ]" the parental presumption in favor of the children's parents in this case is serious error.[36]
Turning back to the facts of the present case, here, the trial court in its Final Decree made the following relevant findings: (1) the appointment of M.G. or J.R.G. as managing conservators would not be in the best interest of the children because the appointment "would significantly impair the children's physical health or emotional development"; (2) it would not be in the best interest of the children to appoint a relative of the children or another person as managing conservator; and (3) the appointment of DFPS as sole managing conservator of the children is in their best interest.
In regard to the trial court's first finding, the burden of proof at trial was on DFPS, which was required to offer evidence of specific actions or omissions of M.G. and J.R.G. showing that awarding custody of the children to them would significantly impair the children, either physically or emotionally. See Lewelling , 796 S.W.2d at 167 ; In re R.L. , 2017 WL 1496955, at *15 ; In re T.R.B. , 350 S.W.3d 227, 233-34 (Tex. App.-San Antonio 2011, no pet.) ; In re W.G.W. , 812 S.W.2d 409, 413 (Tex. App.-Houston [1st Dist.] 1991, no writ). Usually, a non-parent must present evidence that shows that the parents' conduct would have a detrimental effect on the children. May v. May , 829 S.W.2d 373, 376-77 (Tex. App.-Corpus Christi 1992, writ denied) ; see also Lewelling , 796 S.W.2d at 167 ; In re R.L. , 2017 WL 1496955, at *15. And the link between the parents' conduct and harm to the children "may not be based on evidence which raises mere surmise or speculation of possible harm." May , 829 S.W.2d at 377 ; see also In re R.L. , 2017 WL 1496955, at *15 ; In re De La Pena , 999 S.W.2d at 528.
Generally, acts or omissions that constitute significant impairment include, but are not limit to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by a parent. In re S.T. , 508 S.W.3d at 492 ; In re De La Pena , 999 S.W.2d at 528 ; May , 829 S.W.2d at 376-77 ; see also In re R.L. , 2017 WL 1496955, at *15. "Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, *82 and chaotic lifestyle that has put and will continue to put the child at risk." In re S.T. , 508 S.W.3d at 492 ; see also In re R.L. , 2017 WL 1496955, at *15. The material time to consider is the present , and evidence of past conduct may not, by itself, be sufficient to show present unfitness. In re S.T. , 508 S.W.3d at 492 ; see also May , 829 S.W.2d at 377 ("If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling."); In re M.W. , 959 S.W.2d at 666. Moreover, evidence that a non-parent would be a better custodian of the child is "wholly inadequate." Whitworth , 222 S.W.3d at 623 ; see also Lewelling , 796 S.W.2d at 167 ("It is no longer adequate to offer evidence that the nonparent would be a better custodian."); In re De La Pena , 999 S.W.2d at 529 ("There is no dispute that [nonparent] ha[s] provided a caring and nurturing home for [the child]. However, in order for [her] to gain custody of [the child], she must show more.").
Here, there is simply no evidence in the record to show that the appointment of M.G. and J.R.G. as the children's managing conservators would significantly impair the children's physical health or emotional development. See Lewelling , 796 S.W.2d at 167. Notably, at the time the children entered into the care of DFPS, J.J.G., L.K.G., and H.A.G. were, in DFPS's own words, "healthy and developmentally on target for their ages," showing "no signs of abuse or neglect."[37] See In re S.T. , 508 S.W.3d at 492 ("[T]he parent's treatment of other children may be relevant."). And the medical staff at the hospital where A.G.G. received medical treatment for his injuries similarly "assessed" the three oldest children as "healthy."[38] Franco, the DFPS caseworker, also noted that at the time that they entered into DFPS's care, neither J.J.G., L.K.G., nor H.A.G. showed any "sign[s]" of physical abuse.
Further, although J.J.G., L.K.G., and H.A.G. were later "diagnosed with anemia" and J.J.G. was considered to be "under weight," Franco, the DFPS caseworker, testified that these issues with the older children were not "severe."[39] And despite the fact that J.J.G., L.K.G., and H.A.G. have participated in speech and individual play therapy since entering into the care of DFPS, the need for such therapy has not been linked to any acts or omissions by M.G. or J.R.G.
The en banc majority does not seem at all concerned with the fact that DFPS presented no evidence to show that any acts or omissions by M.G. or J.R.G. resulted in the children's need for therapy. Instead, it criticizes M.G. for not presenting "any evidence, beyond her mere assertions, that she could continue to meet the[ ] [special] needs [o]f the children." In doing so, the en banc majority forgets that it is the party seeking appointment as managing conservator, i.e., DFPS, who *83 must affirmatively prove that the appointment of the children's parents would "significantly impair the child [ren]'s physical health or emotional development." TEX. FAM. CODE ANN. § 153.131(a) ; In re J.A.J. , 243 S.W.3d at 616 ; Lewelling , 796 S.W.2d at 166-67 ; see also In re R.L. , 2017 WL 1496955, at *14.
In regard to M.G., the evidence shows that she is "a single mother" who has maintained full-time employment as a cook at the same restaurant for the past seven years. See In re M.J.C.B. , No. 11-14-00140-CV, 2014 WL 6433378, at *3 (Tex. App.-Eastland Nov. 14, 2014, no pet.) (mem. op.) (trial court abused its discretion in not appointing father as managing conservator where evidence showed financial stability and gainful employment); Brigham v. Brigham , 863 S.W.2d 761, 764 (Tex. App.-Dallas 1993, writ denied) (evidence insufficient to support appointment of mother as managing conservator would significantly impair children even though parents in unstable relationship, had separated, and divorced); In re W.G.W. , 812 S.W.2d 409, 414-15 (Tex. App.-Houston [1st Dist.] 1991, no writ) (evidence insufficient to support awarding custody to nonparent despite mother having unsuccessful marriage). M.G. is paid every two weeks approximately $550 to $600, which is sufficient to cover her and the children's monthly expenses, even without the financial assistance of J.R.G.[40] At the time of trial, M.G. had put a deposit down for a larger apartment and was "getting ready to move."[41] She has "no CPS or criminal history" and no history of drug or alcohol abuse, domestic violence, psychiatric or mental health issues, suicidal or self-injurious thoughts or actions, or assaultive behavior. And M.G. does not take any medication. Cf. In re S.T. , 508 S.W.3d at 492.
The "2054 Psychological Evaluation" report, completed in October 2014, describes M.G. as having thought processes that are "logical," "coherent," and "goal-directed," an attitude that is "open and cooperative," and a prognosis that is "GOOD." Morgan, M.G.'s therapist, noted that M.G. is "not homicidal," "suicidal," or "aggressive," and she characterized M.G.'s "risk of VIOLENCE" as "VERY LOW or absent." At most, M.G. has been described as "overwhelmed" or "stressed," which Morgan stated would be a problem for "any mother with four children who has to work." (Emphasis added.) There are simply no "clinical reasons" that impair M.G. from being able to parent the children. Cf. In re R.R. , No. 02-13-00464-CV, 2014 WL 3953930, at *3-4 (Tex. App.-Fort Worth Aug. 14, 2014, no pet.) (mem. op.) (legally- and factually-sufficient evidence supported finding placement with mother would significantly impair child where mother had history of mental disorders, suicidal thoughts, reoccurring postpartum depression, and no job).
In preparation for the children's return, M.G. has changed her work schedule to ensure that she will only work "mornings," and she has "looked into day care," specifically, Sharpstown Day Care, for the children to attend while she is at work. See In re S.T. , 508 S.W.3d at 492 ("The material time to consider is the present ...." (emphasis added)). Prior to the children entering into DFPS's care, M.G. cooked for them, bathed them, "watch[ed] movies with them," "play[ed] and dance[d] with *84 them," "sang with them," took them to visit other children with whom they liked to play, and regularly took them to the doctor. And if the children are returned to her, M.G. intends to arrange her work schedule so that she can "pick [the children] up from school, bathe them, [and] help them on their home work." See Lewelling , 796 S.W.2d at 169-70 (Cook, J., concurring) (no evidence appointment of mother as managing conservator would significantly impair child's physical health or emotional development where "testimony clearly showed that [she] was a good mother" and "kept the child clean, neat, well fed, provided a clean and neat home, took child to the doctor, and was fully capable of providing" for child); cf. In re R.R. , 2014 WL 3953930, at *3 (mother "rarely fed, bathed, changed, or helped care for" child).
Although the en banc majority summarily concludes that "no evidence indicates that [M.G.] ... ha[s] developed the parental abilities necessary to care for" the children, the record evidence establishes otherwise. Since the children entered into the care of DFPS, M.G. has done nearly everything that DFPS has required of her. See In re S.T. , 508 S.W.3d at 492 ("The material time to consider is the present ...." (emphasis added)); May , 829 S.W.2d at 377 ("If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling." (emphasis added)). She has completed her required "psychosocial evaluation," completed the required parenting classes, provided certification of the completed parenting classes to DFPS, has participated in both individual and family therapy, and has provided DFPS with "pay stubs" to verify her employment. And M.G. has informed DFPS of her plans to "transition[ ]" into a two-bedroom apartment and her intent to "use a day care center," specifically Sharpstown Day Care, for the children while she is at work. M.G. has also "consistently" attended all of her scheduled visits with the children. See In re S.T. , 508 S.W.3d at 497-98 (evidence insufficient to support finding appointment of father as managing conservator would significantly impair child where evidence showed he had appropriate housing and income, completed parenting classes, and only had one requirement of FSP remaining).
Further, although M.G. received a "regular" "discharge" from individual therapy in July 2014 because her therapist believed that she was "done" with therapy and had "made progress," M.G., when DFPS required her to attend additional therapy, complied. At the time of trial, M.G. was continuing to participate in the additional therapy that DFPS had required. See ids="12371584" index="140" url="https://cite.case.law/sw3d/508/482/#p489">id. (no significant impairment to child where father had not completed entire counseling requirement before trial). Morgan explained that M.G. had been attending, approximately once a week, both individual counseling and family therapy sessions with her for more than a year. According to Morgan, M.G. has "consistent[ly]" and "time[ly]" attended all of her therapy sessions, and her "behavior in the session[s]" has been "cooperative and attentive." In her therapy notes, Morgan describes M.G. as "very active and responsive" during her therapy sessions. By January 2015, M.G. had "progressed with communicating and asserting herself" and had "identif[ied] changes needed in her routine structure and support system in order to show that she's able to manage taking care of [the] children[ ]." M.G. has "made progress" in her therapy sessions, and her ability to secure a day-care program for the children to attend while she is at work would alleviate Morgan's "concerns about [M.G.'s]
*85 ability to take care of" the children. According to Morgan, there is nothing that she has seen that would "prohibit[ ]" M.G. from "parenting her children." See id. at 492 ("The material time to consider is the present ...." (emphasis added)).
As to why the children should not be returned to M.G., DFPS, at trial, cited M.G.'s past judgment related to "the children's care." Cf. ids="12371584" index="142" url="https://cite.case.law/sw3d/508/482/#p489">id. ("The material time to consider is the present , and evidence of past conduct may not, by itself, be sufficient to show present unfitness." (emphasis added)); see also In re De La Pena , 999 S.W.2d at 532 (although parent's past "may not be stellar," this "does not and should not preclude him from his parental role with" child); May , 829 S.W.2d at 377 ("If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling." (emphasis added)). More specifically, Franco, the DFPS caseworker, expressed concern about the "falling off the bed" incident related to A.G.G., as well as the car seat incident.
In regard to the those incidents, M.G. testified that on January 19, 2014, four days prior to her taking A.G.G. to the hospital, he fell off the bed in her home. According to M.G., A.G.G., who was sitting on the bed "by himself," "kind of jump[ed] and ... ended up on the floor." She explained that she had left him on the bed while she went into the kitchen because A.G.G. "was able to sit on his own and he felt secure or confident to sit on his own." And at that point in his life, A.G.G. was not crawling, had not started to crawl, was not "pulling himself on his stomach," and was only "just beginning to turn[over]." Although M.G. noted that A.G.G. had previously fallen off the bed when he was "four or five months old," she explained that she now realizes that it is not safe to leave A.G.G. on the bed alone. And Dr. Isaac testified that A.G.G.'s fall off the bed would not have caused any of the injuries that he was evaluated for at the hospital. Further, M.G. was able to "console[ ]" A.G.G. after the incident, and there were no "obvious changes" with him after the fall. Cf. In re K.R.B. , No. 02-10-00021-CV, 2010 WL 3928727, at *11 (Tex. App.-Fort Worth Oct. 7, 2010, no pet.) (mem. op.) ("Although relevant, the evidence of [mother's] past criminal conduct and drug use does not demonstrate that appointing [her as] sole managing conservator at the time of trial would have significantly impaired [child]'s physical health or emotional development."). M.G. also noted that neither J.J.G., L.K.G., nor H.A.G. had ever "f[allen] off the bed or any other surface" while in her care.
In regard to the car seat incident, which occurred on January 18, 2014, five days prior to her taking A.G.G. to the hospital, M.G. explained that she, on that day, secured A.G.G. properly in his car seat. However, the car seat was not actually secured or "buckle[d]" into the car correctly, although M.G., at the time, "thought" that it was. And when she made a turn while driving in her car, the car seat "fell" "sideways." Notably, A.G.G. remained safely strapped in his car seat the entire time, was "fine," and properly ate and drank afterwards. And Dr. Isaac again testified that the car seat incident would not have caused any of the injuries for which A.G.G. was evaluated at the hospital.
DFPS also expressed concern at trial about M.G.'s past judgment in leaving the children with individuals whom DFPS characterized as "inappropriate caregivers," specifically Norma and Veronica. Although Franco characterized Norma as an "[in]appropriate" selection for a caregiver, DFPS actually placed A.G.G. with Norma *86 for a period of "[f]our months" after he was injured, and the record reflects that his needs were met by Norma and he sustained no additional injuries in her care. This significantly undermines Franco's assertion that M.G. acted inappropriately in her selection of Norma as a potential caregiver for the children.
In regard to Veronica, DFPS's concern is not unjustified, given that she is one of three individuals, other than M.G. and her friend, Nelly, who had an opportunity to injure A.G.G. However, M.G.'s original decision to have Veronica care for the children while she was at work was not necessarily inappropriate, given that Veronica is her sister-in-law, has children of her own, and has "no criminal or CPS history."[42] In fact, DFPS "actually approved placement of the children" with Veronica after A.G.G. had been injured, completed "[a] background check" on her, and had "no safety concerns" after a visit to her home. (Emphasis added.) All which indicate that at least on the surface, Veronica does not appear to be an inappropriate caregiver selection.
It is imperative to note that the en banc majority criticizes M.G.'s decision to leave A.G.G. in the care of either her friend, Nelly, or her sister-in-law, Veronica, and it considers such a decision to be a "specific act [ ] or omission[ ]" that demonstrates an award of custody to the M.G. would result in physical or emotional harm to the children. However, there is no evidence that M.G. was aware, prior to A.G.G. sustaining injuries, that there was a risk that A.G.G. would have been harmed in the care of either Nelly or Veronica-a woman with children of her own, with "no criminal or CPS history," who DFPS "actually approved placement of the children" with after A.G.G. was injured. (Emphasis added.)
Further, although some witnesses testified regarding their concerns about Veronica's current and future role in M.G.'s life as a "support system[ ]," the record reveals that M.G. has accepted the fact that Veronica likely injured A.G.G. And she testified that Veronica is not a part of her support system "anymore," she does not "turn[ ] to Veronica for help" since A.G.G. was injured, and although Veronica is still married to M.G.'s brother, she does not see her on holidays. See In re S.T. , 508 S.W.3d at 492 ("The material time to consider is the present ...." (emphasis added)); May , 829 S.W.2d at 377 (link between parent's conduct and harm to child "may not be based on evidence which raises a mere surmise or speculation of possible harm"). Further, M.G. explained that she will be sending the children to a day-care facility, specifically Sharpstown Day Care, in the future while she is at work and will not be relying on Veronica to watch the children.[43]
*87 Finally, in regard to A.G.G., based on the evidence presented at trial, there is no doubt that he sustained serious injuries at the hands of an adult, but an adult who is "unknown." At trial, the parties seemed to focus on three individuals, M.G., Veronica, and Nelly, as the potential caregivers who could have injured A.G.G. M.G. repeatedly told Morgan, her therapist of more than a year, that "she did not hurt" A.G.G., and M.G. "has not said anything" or done "anything" that has "caused [Morgan] to believe" that M.G. caused A.G.G.'s injuries. In her therapy notes, Morgan opines that "the possibility of [M.G.] having been the one to hurt her child[ ] is low. " (Emphasis added.) Morgan further characterized M.G. as being "devastated" by what happened to A.G.G., and she noted that M.G. "cares [for] and loves" the children. At trial, M.G. specifically denied "shak[ing]" A.G.G. and "twist[ing] his ankles," and she testified that she has "never harmed any of [her] children." M.G. has willingly spoken with law enforcement officers, "the social worker at the hospital," and other DFPS investigators about A.G.G.'s injuries. And M.G. has never "been charged" with "[a] crime" related to A.G.G.[44] Further, Dr. Isaac noted that M.G. acted "appropriate[ly]" in seeking medical treatment for A.G.G. once his symptoms moved beyond "irritability," which could have been related to nothing more than his cough. And since A.G.G.'s birth, M.G. has consistently taken him to doctor's appointments for "[w]ell child check[s]," for immunizations, and when he was experiencing coughing and "[w]heezing." In fact, A.G.G. was seen by his primary care physician a week prior to his arrival at the hospital, and the physician did not detect any signs of abuse on the child. Cf. In re R.D.Y. , 51 S.W.3d 314, 321 (Tex. App.-Houston [1st Dist.] 2001, pet. denied) (retention of mother as sole managing conservator detrimental to welfare of child where mother left child, dirty and hungry, alone at church, child was afraid of mother, mother forced child to bathe in bleach, and mother displayed signs of violence).
In regard to J.R.G., the evidence at trial showed that he is currently employed and is paid $2,400 per month. See In re M.J.C.B. , 2014 WL 6433378, at *3 (trial court abused its discretion in not appointing father managing conservator where evidence showed gainful employment and financial stability). Since H.A.G. was born in June 2012, and M.G. began requesting financial assistance, J.R.G. has been paying her approximately $400 to $500 every month to cover her rent and for "things that [she] needed." According to M.G., J.R.G. has "continued to pay [her] rent" since the birth of H.A.G. Further, since he signed the Irrevocable Children's Protective Services Mediated Settlement Agreement in February 2015, J.R.G. has paid M.G. $1,500 each month in accordance with the terms of that agreement. Notably, there is no evidence that J.R.G. has a history of drug or alcohol abuse or mental illness, a criminal history, a CPS history, or a history of suicidal thoughts or self-injurious behavior. Cf. In re S.T. , 508 S.W.3d at 492 (listing acts or omissions constituting significant impairment); In re De La Pena , 999 S.W.2d at 528 (same).
*88 Nor did DFPS present any evidence at trial that J.R.G. is an aggressive or violent person or that he was the perpetrator of A.G.G.'s injuries. And the evidence shows that J.R.G. provided his three oldest children, who are now over the age of eighteen, with food, shelter, and education when they were growing up. See In re S.T. , 508 S.W.3d at 492 ("[T]he parent's treatment of other children may be relevant.").
At trial, Franco, the DFPS caseworker, explained that DFPS did not want the children returned to J.R.G. because he had not "actively participated" in their lives and displayed a lack of "a desire to care for all four of his children." According to Franco, J.R.G. had not "consistently been a part of the children's lives," had not "provided them with financial support," and had not "consistently visited with them or formed a bond with them."
Notably, J.R.G. readily admitted that, in the past, he did not assume responsibility for the children, and the evidence shows that he would disappear from the children's lives for periods of time since M.G. became pregnant with J.J.G. in 2009. But see In re S.T. , 508 S.W.3d at 492 ("The material time to consider is the present ...." (emphasis added)); May , 829 S.W.2d at 377 ("If the parent is presently a suitable person ..., the fact that there was a time in the past when the parent would not have been a proper person to have ... custody is not controlling." (emphasis added)). However, this does not constitute evidence of significant impairment. See Lewelling , 796 S.W.2d at 165-69 (mother's failure to see child for two months not evidence appointment of her as managing conservator would significantly impair child); In re M.J.C.B. , 2014 WL 6433378, at *2-3 (father's absence from children's lives for approximately two years not evidence appointment of him as managing conservator would significantly impair children's physical health or emotional development); Brigham , 863 S.W.2d at 764 ("The fact that [m]other left town without telling anyone of her exact whereabouts ... is not evidence of significant impairment to the children.... The fact that [mother] was not available for telephone calls ... is not evidence that placement with [her] would emotionally impair the children."). Further, J.R.G. testified that within the last two years, he has become "closer" with the children and has taken "responsib[ility] for the expenses [that M.G.] incurs because of the children." Cf. In re J.A.J. , No. 04-14-00684-CV, 2014 WL 7444340, at *3 (Tex. App.-San Antonio Dec. 31, 2014, no pet.) (mem. op.) (evidence mother failed to pay child support did not constitute evidence of specific acts or omissions demonstrating awarding her conservatorship would result in physical or emotional harm to her children). And during the periods when J.R.G. was absent from the children's lives, M.G. noted that she would still speak with him by telephone. When J.R.G. did visit the children, it was usually for several hours once or twice a week, and he would "watch movies" with them, "play with them," and "devote[ ]" time to them. According to M.G., J.R.G. has visited J.J.G. "[m]any" times and "loves the children." Prior to the children entering into the care of DFPS, he saw them in January 2014, and he has seen the children since that time, albeit not as frequently as M.G.
Further, J.R.G. testified that he would continue to stay involved in the children's lives and support them if they are returned to M.G. Although it does not appear that all of the four children would be able to move into the home that J.R.G. shared with his wife at the time of trial, J.R.G. did testify that he "would move with [the] children" somewhere "alone," "get an *89 apartment," and provide them with "stable housing" if they are returned to him.[45]
In regard to A.G.G., DFPS did not present evidence to establish that J.R.G. was responsible in any way for the injuries sustained by A.G.G. And J.R.G. testified that he did not know who "broke [A.G.G.'s] ankles" or who "shook" A.G.G. J.R.G. was very "concern[ed]" about what had happened to A.G.G., and he went to the hospital to see A.G.G. after the child was injured.
Unfortunately, the children have been in the care of DFPS since A.G.G. was injured in January 2014. At the time that they entered into DFPS's care, J.J.G., L.K.G., H.A.G., and A.G.G. were three years old, two years old, one year old, and less than one year old, respectively. Although it appears that the children have been well cared for since that time, the fact that DFPS is a good, or might even be a better, custodian of the children is not enough to show that the children will be significantly impaired by the appointment of M.G. and J.R.G. as their managing conservators. Lewelling , 796 S.W.2d at 167 ; Whitworth , 222 S.W.3d at 623 ; see also In re De La Pena , 999 S.W.2d at 529 ("There is no dispute that [nonparent] ha[s] provided a caring and nurturing home for [the child]. However, in order for [her] to gain custody of [the child], she must show more."). Nor is the fact that the children have lived the majority of their lives outside the care of their parents or that M.G. and J.R.G. have had limited access to the children because DFPS has never increased their visitation time since the children entered into its care enough either. See In re B.B.M. , 291 S.W.3d 463, 467-68 (Tex. App.-Dallas 2009, pet. denied) ("[Any] focus on potential harm caused by the child's removal [from the current placement] is misplaced. The proper focus ... is solely upon whether the placement of the child with the natural parent would significantly impair the child's physical health or emotional development."); Harris v. Tex. Dep't of Family & Protective Servs. , 228 S.W.3d 819, 829 (Tex. App.-Austin 2007, no pet.) (noting child "comfortable" in non-parent home, but child "has also been denied contact with his natural parent [for years], and this lack of contact is a result of [DFPS's] decisions ," not his parent's decisions (emphasis added)).
Further, here, there is no evidence that uprooting the children from their current placement will rise to the level of significant impairment to their emotional development. See In re J.C. , 346 S.W.3d 189, 194-95 (Tex. App.-Houston [14th Dist.] 2011, no pet.) (no evidence removal of child from non-parent "would be 'devastating' or akin to 'psychological amputation' or cause 'serious psychological damage' " (quoting In re Rodriguez , 940 S.W.2d 265, 273 (Tex. App.-San Antonio 1997, writ denied) )); Gray v. Shook , 329 S.W.3d 186, 198 (Tex. App.-Corpus Christi 2010), rev'd in part on other grounds , 381 S.W.3d 540 (Tex. 2012) (trial court abused its discretion where evidence showed only possible harm to child by "uprooting" and not any specific, identifiable act or omission, conduct or behavior of parent (internal quotations omitted)); In re De La Pena , 999 S.W.2d at 532-33 (no evidence that child's visits with father resulted in disruptive or uncharacteristic behavior).
Notably, the en banc majority improperly penalizes M.G. for only having "supervised contact with the children for two hours a month," when it is not her decision to limit her contact with the children. See Harris , 228 S.W.3d at 829 (trial court *90 erred in naming DFPS managing conservator where although child "comfortable" in non-parent home, he "ha[d] also been denied contact with his natural parent [for years], and this lack of contact is a result of [DFPS's] decisions ," not his parent's decisions (emphasis added)). But as Texas courts have concluded, such evidence does not support a finding that the appointment of M.G. or J.R.G. as managing conservators of the children would significantly impair their physical health or emotional development. See, e.g. , ids="8402276" index="170" url="https://cite.case.law/sw3d/228/819/#p829">id.
After considering the evidence in the light most favorable to the trial court's judgment, it is readily apparent that the evidence is legally insufficient to support the trial court's finding that the appointment of M.G. and J.R.G. as managing conservators of the children would significantly impair the children's physical health or emotional development. Accordingly, I would hold that the trial court abused its discretion in appointing DFPS as the sole managing conservator of the children. See In re M.W. , 959 S.W.2d at 665 ("[T]he right of a parent to raise his or her child is an 'essential right' and a 'basic civil right of man' and woman." (quoting Stanley v. Illinois , 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) )).
Further, I would sustain M.G.'s and J.R.G.'s first issues,[46] which the panel majority did, reverse the portion of the trial court's Final Decree awarding sole managing conservatorship of the children to DFPS, and remand the case to the trial court for rendition of an order appointing M.G. and J.R.G. as joint managing conservators of the children and for further proceedings consistent with this opinion. See Shook , 381 S.W.3d at 543 (remanding cause); Lewelling , 796 S.W.2d at 168-69 (remanding for rendition); In re A.D.P. , No. 11-12-00273-CV, 2013 WL 870689, at *4-5 (Tex. App.-Eastland Mar. 7, 2013, no pet.) (mem. op.) (reversing trial court's order awarding managing conservatorship of children to DFPS and remanding for rendition after holding DFPS "failed to offer legally ... sufficient evidence to support the trial court's finding ... that the appointment of [parent] as the managing conservator of [the children] would significantly impair their physical health and emotional development").
Because the en banc majority seriously errs in concluding otherwise, merely disagrees with the panel majority's original holding, mischaracterizes the record evidence, improperly holds that the presumption in favor of the children's parents is negated in this case, and deprives two parents, without any evidence that they will impair their children's physical health or emotional development, of the right to care for and raise their children, I respectfully dissent from the granting of en banc reconsideration in this case. See TEX. R. APP. P. 41.2(c) ("En banc consideration of a case is not favored and should not be ordered unless necessary to secure or maintain uniformity of the court's decisions or unless extraordinary circumstances require en banc consideration."); TEX. GOV'T CODE ANN. § 22.001(a)(6) (Vernon 2004) ("The supreme court has appellate jurisdiction ... when ... an error of law has been committed by the court of appeals, and that error is of such importance to the jurisprudence of the state that ... it requires correction....").

See Lewelling v. Lewelling , 796 S.W.2d 164, 166, 168 (Tex. 1990).

See Stukenberg v. Abbott , No. 2:11-CV-84, 2017 WL 74371, at *3-4 (S.D. Tex. Jan. 9, 2017) (quoting Department of Family and Protective Services ("DFPS") Commissioner Henry "Hank" Whitman, Jr.'s letter to Texas Governor Greg Abbott, stating, "CPS has seen an increase in the number of children without placement[s]. The result of this capacity issue is that ... children spend extended time sleeping in CPS offices, hotels, or emergency shelters" (internal quotations omitted)); Meagan Flynn, Will the Latest Foster Care Reforms in Texas Actually Solve the Crisis , HoustonPress , June 1, 2017, http://www.houstonpress.com/news/governor-abbott-thinks-the-foster-care-reforms-will-make-texas-the-best-in-the-country-will-they-9485460 (noting "because of the shortage of foster homes, many kids [are] ... having to sleep in CPS offices" and "one such foster teen sleeping at a Houston office ran away from the office earlier this year and was hit by a car and killed"); Robert T. Garrett, Children Sleeping in CPS Offices Spiked in March, Mystifying Texas Officials , Dall. Morning News , Apr. 14, 2017, https://www.dallasnews.com/news/child-protective-services/2017/04/14/children-sleeping-cps-offices-spikes-march-mystifying-texas-officials (noting "shortage of foster care beds ... has plagued Texas intermittently since about 2007" and explaining "[s]ometimes, no one will take certain abused and neglected children"); Letter from Greg Abbott, Governor, State of Tex., to Henry "Hank" Whitman, Jr., Comm'r, Tex. Dep't of Family & Protective Servs. (Oct. 12, 2016), https://gov.texas.gov/uploads/files/press/DFPS_Whitman_10122016.pdf ("It is unacceptable that children are sleeping in Child Protective Services offices."); see also M.D. v. Abbott , 152 F.Supp.3d 684, 813, 816 (S.D. Tex. 2015) ("DFPS has known about its [placement] array problems for years. In 2006, DFPS knew there were 'children without placement[s].' ... By 2008, DFPS knew that it had 'placement quality and capacity issues'...." (second alteration in original)).

As former Texas Supreme Court Justice Harriett O'Neill has emphasized, Texas courts play a "critical role ... [a]s gatekeepers for families in crisis" and "have a profound impact on children and families" when "the stakes are exceedingly high." Justice (retired) Harriet O'Neill, Court: Gatekeepers for Families in Crisis , 70 Tex. B.J. 666, 668 (2007) ; see also Tex. Appleseed, Texas Children in Long-Term Foster Care: Outcomes, Court Hearing Practices, and Court Costs 3 (May 2012), https://www.texasappleseed.org/sites/default/files/08-FosterCareConsistentImplementationReport [hereinafter Tex. Appleseed, Texas Children ] ("Judges must recognize their critical part in the [permanent managing conservatorship] process...."); Tex. Appleseed, Improving the Lives of Children in Long-Term Foster Care: The Role of Texas' Courts & Legal System 6 (Nov. 2010), http://texaschildrenscommission.gov/media/1281/appleseedstudy.pdf [hereinafter Tex. Appleseed, Improving Lives ] (noting "[t]he judicial system ... plays a critical role").

While the children at issue in the instant case do not appear to have been subjected to stays in state office buildings, this is not true of every child in the care of DFPS. By affirming the trial court's award of permanent managing conservatorship to DFPS and preventing the children in this case from returning home, other children in DFPS's care are being deprived a desperately-needed safe place to live. See Stukenberg , 2017 WL 74371, at *4 (referencing DFPS spokesperson Shari Pulliam's comments, "[w]e are desperate for foster parents all across the state" and "[c]hildren are being placed outside the county they are removed from every day, because we just don't have the foster care placements in their own counties" as well as DFPS Commissioner Henry "Hank" Whitman, Jr.'s statement, "Texas lacks adequate, high-quality foster care capacity" (first alteration in original) (internal quotations omitted)).

See Tex. Fam. Code Ann. § 263.405(a) (Vernon 2014); Tex. R. App. P. 28.4.

See Tex. Gov't Code Ann. § 54.808(1) (Vernon 2013) ("A judge may refer to a master any civil case or portion of a civil case brought ... under Title 1, 2, 3, 4, or 5, Family Code[.]"); see also id. §§ 54.809 (method of referral to master), 54.810 (powers of master), 54.816 (findings and returning to referring court), 54.817(a)-(b) (Vernon 2013) (court action after receiving master's report); Judicial Dist. Ct. Harris Cty., Juvenile Trial Div. Loc. R. 3.6 (referrals to master/associate judge).

"In August 2009, 13,517 children were 'permanently' in the State [of Texas's] care. However, this is not 'true permanence' in the sense of [a] child[ ] having a single safe and stable family for the duration of his or her childhood and adolescence." Tex. Appleseed, Improving Lives , supra note 3, at 5, 9 (explaining, although "there is a sense that [a] child has achieved some 'permanency' " when he enters permanent managing conservatorship, "[n]othing is farther from reality"); see also M.D. , 152 F.Supp.3d at 691 ("There are approximately ... 12,000 children in [permanent managing conservatorship] at any given time."). Further, while the State's "responsibility for [a] child's life and well-being does not change when [he] enters [permanent managing conservatorship,] ... the attention paid to th[at] child[ ] ... diminishes significantly." Tex. Appleseed, Texas Children , supra note 3, at 3; see also M.D. , 152 F.Supp.3d at 691-92 (children in permanent managing conservatorship are "effectively deprive[d] ... of an individual advocate," "get ignored more," have "significantly less attention" paid to them by caseworkers, and visits with caseworkers are "less meaningful and more rushed" and considered cursory (internal quotations omitted)); Craig Malisow, There's Little Outrage for 12,000 Kids Suffering in the Texas Foster Care System , HoustonPress , Feb. 16, 2016, http://www.houstonpress.com/news/there-s-little-outrage-for-12-000-kids-suffering-in-the-texas-foster-care-system-8161341 (characterizing permanent managing conservatorship as the "gutter of DFPS" and noting permanent managing conservatorship children are "written off and expected to be banished to state custody until they age[ ] out at 18"); Tex. Appleseed, Improving Lives , supra note 3, at 7 (explaining once "the court enters an order appointing DFPS as 'Permanent Managing Conservator,' the level of scrutiny paid to individual cases significantly decreases-regardless of whether parental rights to the child were terminated" and "the attention paid to the child's case diminishes drastically").
Unfortunately, "[b]oth the total number of children in foster care and the total number of children in [permanent managing conservatorship] are increasing statewide." Tex. Appleseed, Texas Children , supra note 3, at 7. In Harris County, specifically, the permanent managing conservatorship "population per capita has increased consistently." Id. Certain judges have described children in permanent managing conservatorship as "like ... inmate[s] serving time until they've reach 18" and as "children that even God has forgotten." M.D. , 152 F.Supp.3d at 782 (alterations in original) (internal quotations omitted). At this time, it is undeniable that "Texas's foster care system is broken.... Most importantly, though, it is broken for Texas's [permanent managing conservatorship] children, who almost uniformly leave State custody more damaged than when they entered." Id. at 828 (noting "Texas's [permanent managing conservatorship] children [are] shuttled throughout a system where rape, abuse, psychotropic medication, and instability are the norm").

At the time of trial, J.J.G. was five years old, L.K.G. was four years old, H.A.G. was three years old, and A.G.G. was two years old.

See Tex. Fam. Code Ann. § 263.404 (Vernon Supp. 2016).

The standard for en banc consideration is not whether a majority of the en banc court ... disagree[s] with all or a part of a panel opinion. Neither is an assertion that an issue is "important" sufficient. Rather, when there is no conflict among panel decisions, the existence of "extraordinary circumstances" is required before en banc consideration may be ordered.
Thompson v. State , 89 S.W.3d 843, 856 (Tex. App.-Houston [1st Dist.] 2002, pet. ref'd) (Jennings, J., concurring in denial of en banc reconsideration); see Tex. R. App. P. 41.2(c) ("En banc consideration of a case is not favored and should not be ordered unless necessary to secure or maintain uniformity of the court's decisions or unless extraordinary circumstances require en banc consideration.").

See Tex. Fam. Code Ann. § 153.131(a) -(b) (Vernon 2014) (presumption appointment of parents as joint managing conservators in best interest of child); In re V.L.K. , 24 S.W.3d 338, 341, 343 (Tex. 2000) (explaining natural parent "has the benefit of the parental presumption ... and the nonparent seeking conservatorship has a higher burden" (emphasis added)); Lewelling , 796 S.W.2d at 167 (strong presumption in favor of parental custody); Whitworth v. Whitworth , 222 S.W.3d 616, 623 (Tex. App.-Houston [1st Dist.] 2007, no pet.) ("There is a strong presumption that the best interest of a child is served if a natural parent is appointed as a managing conservator.").

"[T]he interest of parents in the care, custody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." Troxel v. Granville , 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) ; see also Santosky v. Kramer , 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (parent's right to "the companionship, care, custody, and management of" his children is constitutional interest "far more precious than any property right" (internal quotations omitted)); Holick v. Smith , 685 S.W.2d 18, 20 (Tex. 1985) ("This natural parental right has been characterized as 'essential,' 'a basic civil right of man,' and 'far more precious than property rights.' " (quoting Stanley v. Illinois , 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) )).

See Tex. Gov't Code Ann. §§ 54.808, 54.809, 54.810, 54.816, 54.817 ; see also Judicial Dist. Ct. Harris Cty., Juvenile Trial Div. Loc. R. 3.6.

The en banc majority describes A.G.G. as being "legally blind" as a result of his injuries. However, the record does not support such a characterization. In fact, Dr. Isaac specifically stated that she could not testify as to whether A.G.G. was "legally blind," and M.G. explained that A.G.G. is not "blind," but rather he is "not able to focus his eye." And this problem will "be corrected with surgery in the future."

The master admitted into evidence a Physician's Statement, which reflects that M.G.'s sister-in-law, Veronica, had cared for A.G.G. for six hours on January 20, 2014, while M.G. was at work. On that day, A.G.G.'s "cough symptoms slowly began," but he "slept well through the night." The next day, on January 21, 2014, M.G.'s "friend," Nelly, cared for A.G.G. for six and a half hours, while M.G. was at work. On that day, A.G.G.'s "cough symptoms continued," but he ate and drank "adequate [ly]." Nelly, however, reported to M.G. that A.G.G. had "cried for prolonged periods [of time] and appeared irritable"; thus, she was concerned about a possible "sore throat." On January 22, 2014, Veronica again cared for A.G.G. for nine hours. On that day, A.G.G. showed decreases in his eating and drinking, "cr[ied]" and "tremble[d]," and "sle[pt] for longer periods of time." (Internal quotations omitted.) After A.G.G. vomited four times on January 23, 2014, M.G. sought medical treatment for him.

Dr. Isaac opined that the "impaction fracture on [A.G.G.'s] right radius" likely occurred within the two weeks prior to his arrival at the hospital.

The Physician's Statement also indicates that M.G. "works in a restaurant" and the family has no "[h]istory of drug[ ] or alcohol abuse," "mental illness," "domestic violence," "past or current involvement with law enforcement," or "past or current involvement with CPS."

The master admitted into evidence J.R.G.'s Family Service Plan ("FSP"), which was prepared by DFPS and states that the older children "have no special needs and appear[ ] developmentally on target as compared to other children their ages." See In re K.N.D. , No. 01-12-00584-CV, 2014 WL 3970642, at *6 (Tex. App.-Houston [1st Dist.] Aug. 14, 2014, no pet.) (mem. op.) (DFPS creates FSP).

Del Sol noted that J.J.G. still speaks Spanish with his foster parents.

The master admitted into evidence a portion of Morgan's notes from her therapy sessions with M.G. In her notes, Morgan indicates that she first met with M.G. on May 20, 2014.

In her therapy notes, Morgan indicates that M.G. explained to her that when "she went to pick up her children," Veronica "told her there may be something wrong with" A.G.G. because he was "crying a lot." After she took the children home, M.G. "noticed [that A.G.G.] was sleeping too much." And "when he awoke," A.G.G. "vomited and continued to vomit." M.G. then "became concerned and decided to take him to see a doctor."

In her therapy notes, Morgan indicates that J.R.G. attended "joint session[s]" with M.G. on November 24, 2014, December 8, 2014, December 16, 2014, and December 29, 2014.

In her therapy notes, Morgan further indicates that J.R.G. "preferr[ed] [that the] children be reunified" with M.G., "but if that was not possible[,] then he was willing to take ... the oldest two because those are the two that know him."

Only recently did M.G. become aware of J.R.G.'s marital status.

At times during trial, M.G. contradicted herself, stating that J.R.G. did not "support" her while he was purportedly away in Mexico.

The master admitted into evidence money orders reflecting J.R.G.'s payments.

The FSPs for both J.R.G. and M.G., which were prepared by DFPS and admitted into evidence, also state that M.G. is employed, has "stable housing," and her home is "clean and free of any apparent health or safety hazards; the home has working utilities and food for the family." See In re K.N.D. , 2014 WL 3970642, at *6 (DFPS creates FSP). Further, the FSPs note that M.G. "ensures [that] the children's physical needs as well as the financial responsibilities of the home are met." M.G. and the children also "have the understanding that the children verbalize their needs and [M.G.] then meet[s] those needs," M.G. also observes "cues from the children due to their ages," and "[t]his understanding helps to ensure the children's safety."

According to M.G., Ramona only watched the children for "a short period of time" "[a]round ... November to December" of 2013.

J.R.G.'s eldest three children are over eighteen years old.

J.R.G. noted that A.G.G. is "just now beginning" to bond with him.

J.R.G. noted that his wife would be willing to have two of the children live in their home.

J.R.G. explained that his oldest daughter's three children and his other two older children currently live in the home that he shares with his wife.

A.G.G.'s medical records show that M.G. took A.G.G. to twelve doctor's appointments from the time that he was born to when he was injured at seven months old. The records show that A.G.G. saw his primary care physician for routine "[w]ell child check[s]" and when he suffered from a cough or "[w]heezing." The medical records also reveal that A.G.G. has received appropriate immunizations and "[h]earing check[s]," and they described him as being "well nourished" and "well developed," with "no apparent distress." At the time he was injured, A.G.G. was in top percentiles for weight and height.

In determining the best interest of a child, courts may consider the following non-exhaustive factors: (1) the child's desires; (2) the current and future physical and emotional needs of the child; (3) the current and future physical and emotional danger to the child; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. See Holley v. Adams , 544 S.W.2d 367, 371-72 (Tex. 1976) ; In re S.T. , 508 S.W.3d 482, 490 (Tex. App.-Fort Worth 2015, no pet.) ; In re L.M. , 104 S.W.3d 642, 647 (Tex. App.-Houston [1st Dist.] 2003, no pet.).

"The parental presumption is based upon the natural affection usually flowing between parent and child." In re V.L.K. , 24 S.W.3d at 341. And "[t]he presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law." Lewelling , 796 S.W.2d at 166 ; see also In re V.L.K. , 24 S.W.3d at 341.

Further, even were section 153.004(b) applicable to the instant case, it still only creates a "rebuttable" presumption and does not prevent a parent from being named the managing conservator. See Tex. Fam. Code. Ann. § 153.004(b) (Vernon 2014); Baker v. Baker , 469 S.W.3d 269, 275-76 (Tex. App.-Houston [14th Dist.] 2015, no pet.) ; see also Varela v. Varela , No. 03-04-00505-CV, 2006 WL 821364, at *4 (Tex. App.-Austin Mar. 30, 2006, no pet.) (mem. op.) (noting rebuttable nature of presumption); In re D.R. , 177 S.W.3d 574, 582 n.6 (Tex. App.-Houston [1st Dist.] 2005, pet denied) (same).

It is a mischaracterization of the record to describe all of the children as "special-needs" as the en banc majority does throughout its opinion. In fact, J.R.G.'s FSP, which was prepared by DFPS, specifically states that the older children "have no special needs" and are "developmentally on target as compared to other children their ages." See In re K.N.D. , 2014 WL 3970642, at *6 (DFPS creates FSP).

The Physician's Statement also states: "All older children are healthy."

Further, in regard to J.J.G., specifically, who was almost four years old at the time he entered into DFPS's care, he did not have a "speech delay" and spoke Spanish. And Del Sol, the owner of the children's day care facility, testified that there was "nothing wrong" with the fact that he liked to "do[ ] his own activities."

The FSPs of M.G. and J.R.G. note that M.G. is "meeting the children's physical, emotional, and medical needs" and she "ensures ... [that] the financial responsibilities of the home are met."

M.G.'s home has been described as "stable" and "clean and free of any apparent health or safety hazards," with "working utilities and food."

Although M.G. admitted that she had observed a bruise and a scrape on A.G.G. at the beginning of January when he returned from the care of Veronica, M.G. stated that the bruise was the size of "a dime" and Veronica had told her that the scrape came from "the carpet." After this occurrence, A.G.G.'s primary care physician, who evaluated A.G.G., described him as "well nourished" and "well developed," with "no apparent distress." Further, Dr. Isaac, in regard to the fractures to A.G.G.'s tibias, noted that a parent, such as M.G. or J.R.G., would not have been able to notice them. And, in regard to the "retinal hemorrhaging" suffered by A.G.G., Isaac similarly opined that it would have been impossible for a parent, like M.G. or J.R.G., to have been able to detect it from "looking at the child."

Inexplicably, the en banc majority summarily concludes that "there [i]s limited evidence" that M.G. "would not return the children to the same caregivers while she work[s]." The record, however, does not support the conclusion.

The en banc majority criticizes M.G.'s inability to explain A.G.G.'s injuries and considers her lack of knowledge as justification for not returning the children to her care. However, in doing so, the en banc majority neglects to consider that, logically speaking, M.G. would not be able to explain how A.G.G. was injured, if she was not the person who injured him or was not present when he was injured. Further, the en banc majority fails to consider that even law enforcement officials have not been able to determine who injured the child. And the en banc majority's baseless assertion that M.G. "made up stories to explain away each injury" is unworthy of an impartial court.

J.R.G. also testified that, at the very least, the two oldest children would be able to live with him at the home that he shares with his wife.

For purposes of this dissenting opinion, it is not necessary to address the remaining arguments and issues presented by M.G. and J.R.G. on appeal. See Tex. R. App. P. 47.1.